UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                       Plaintiff,

       v.

RICHARD DZIONARA-NORSEN,

                   Defendant.
_____

DECISION & ORDER and
REPORT & RECOMMENDATION

19-CR-6131G

## PRELIMINARY STATEMENT

By Order of Hon. Frank P. Geraci, Jr., Chief United States District Judge, dated August 9, 2019, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 44).

Defendant Richard Dzionara-Norsen ("Dzionara-Norsen") has been charged in a three-count indictment with actual and attempted distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A), 2252A(a)(5)(B) and 2252A(b)(1) & (2). (Docket # 42). Currently pending before this Court for report and recommendation are Dzionara-Norsen's motions to dismiss the indictment and to suppress statements and evidence. (Docket ## 47, 59, 66). Also pending before this Court is Dzionara-Norsen's application for disclosure of grand jury materials.[1] (Docket # 59). For the reasons discussed below, I deny

---

[1] Dzionara-Norsen's omnibus motion also sought, *inter alia*, *Brady* material, discovery and inspection, evidentiary rulings pursuant to Rules 404(b), 608 and 609, *Jencks* materials, preservation of rough notes, and leave to file additional motions. (Docket # 47). Each of these requests was either resolved by the parties or decided in open court by the undersigned on November 7, 2019. (Docket ## 54, 55).

Dzionara-Norsen's request for grand jury materials and recommend that the district court deny

Dzionara-Norsen's motions to dismiss the indictment and to suppress statements and evidence.


## FACTUAL BACKGROUND

Dzionara-Norsen seeks to dismiss the indictment on the grounds that the

prosecution against him is selective and that insufficient evidence supports the indictment.

(Docket # 59 at ¶¶ 36-59).  He also seeks to suppress statements he made during an interview

conducted by Federal Bureau of Investigation ("FBI") Agent Barry Couch ("Couch") and Task

Force Officer Carlton Turner ("Turner") on June 13, 2018, and to suppress evidence seized from

him that day.  (Docket ## 47 at ¶¶ 36-46, 47-49; 59 at ¶¶ 60-76, 79-89; 66).  Finally, he seeks to

suppress statements he made during a polygraph examination conducted the following day by

Special Agent James Markovich ("Markovich").  (Docket ## 47 at ¶ 50; 59 at ¶¶ 77-78).  The

June 13 interview was recorded; the June 14 interview was not.

On December 18, 2019, this Court held an evidentiary hearing on the suppression

motions.  (Docket ## 56, 57).  The government elicited testimony from Couch and Markovich;

the defense called no witnesses.  (*Id.*).


I.    **June 13, 2018 Interview**

Couch testified that he had been an agent with the FBI for approximately eleven

years and was assigned to the Child Exploitation Task Force.  (Tr. 4).[2]  According to Couch, in

March 2018, an undercover FBI officer received a video containing suspected child pornography

from an IP address associated with Dzionara-Norsen.  (Tr. 19).  On June 13, 2018, Couch and

---

[2]  The transcript of the December 18, 2019 hearing shall be referred to as "Tr. __."  (Docket # 57).

Turner went to Dzionara-Norsen's apartment to attempt to interview him about the video. (Tr. 5-6, 37-38). Before going to Dzionara-Norsen's apartment, Couch had spoken to the Brighton Police Department and had learned that Dzionara-Norsen suffered from some mental health issues and had undergone a mental health arrest in February 2018. (Tr. 38-39, 58). According to Couch, he was unable to recall whether he knew Dzionara-Norsen's specific mental health diagnoses, including whether he suffered from suicidal ideation, anxiety or depression. (Tr. 39-40).

When they went to Dzionara-Norsen's apartment, Couch and Turner were dressed in plain clothes and, although they were armed, their firearms were not visible. (Tr. 11-12; 34, 36). Couch testified that Dzionara-Norsen answered the door after their second knock and exited the apartment to talk to them on the landing outside his apartment door. (Tr. 5-6, 9-10, 35-36; Government's Exhibits ("G. Exs.") 1 and 2). According to Couch, their interaction lasted approximately twenty minutes and was recorded by a concealed digital recorder. (Tr. 12-13; G. Ex. 3). Couch testified that Dzionara-Norsen was coherent throughout the interview and did not appear to be impaired by alcohol or drugs. (Tr. 13).

Couch commenced the interview by introducing himself and Turner. (Tr. 10-11; G. Ex. 3 at 3:02 – 3:06). Couch told Dzionara-Norsen that they normally dealt with more "important" matters, but that they wanted to talk to him regarding his child pornography activity in order to ensure that he was not someone that they needed to be "concerned about" or "target." (Tr. 49-52; G. Ex. 3 at 3:10 – 3:48). Couch stated that records showed that Dzionara-Norsen periodically viewed child pornography and he wanted "to make sure [Dzionara-Norsen] was willing to get some counseling." (G. Ex. 3 at 3:50 – 4:04). Couch told Dzionara-Norsen that when they were ready to leave "in a few minutes," they wanted to be confident that

Dzionara-Norsen would be getting counseling.  (G. Ex. 3 at 4:06 – 4:08).  Couch communicated

that he did not believe that Dzionara-Norsen was producing child pornography or was associated

with young children.  (G. Ex. 3 at 4:08 – 4:15).  Couch admitted that he was attempting to

"minimize" the situation and to give Dzionara-Norsen the impression that the FBI did not have

significant information about him.  (Tr. 51-52).  He also conceded that Dzionara-Norsen was in

fact an FBI target at the time of the interview.  (Tr. 51-52).

Couch advised Dzionara-Norsen that he could speak to his therapist about child

pornography, but cautioned him against stating that he had downloaded child pornography,

which would require his counselor to report the conduct.  (G. Ex. 3 at 7:58 – 8:40).  In response

to Couch's comments, Dzionara-Norsen denied that he "struggled" with child pornography.

Dzionara-Norsen admitted that he downloaded content, but indicated that he deleted it right away

and denied storing it.  (G. Ex. 3 at 4:26- 4:37).  Couch testified that he confronted

Dzionara-Norsen with a screenshot image taken from the video that was allegedly downloaded

from the IP address associated with Dzionara-Norsen, which depicted a prepubescent age girl

exposing her genital area.  (Tr. 18-19, 31-32).  Dzionara-Norsen admitted that he was using

peer-to-peer programs at the time of the download and stated that the download associated with

the screen shot was the "last time" he had downloaded child pornography.  (G. Ex. 3 at 6:08 –

6:10, 11:03 – 11:06).  He also admitted that he knew that child pornography was illegal.  (G. Ex.

3 at 6:43 – 6:47).

Dzionara-Norsen denied hosting a server; he indicated that he had a laptop that he

used to download the content, which he still possessed.  (G. Ex. 3 at 11:12 – 11:33).  Couch

asked him whether that was the only computer he used to download such content, and

Dzionara-Norsen responded affirmatively.  (G. Ex. 3 at 11:28 – 11:30).  Couch asked whether

Dzionara-Norsen was "willing to show us that, show us that laptop" and asked whether Dzionara-Norsen would mind "getting it and just showing it to us?" (Tr. 52-53; G. Ex. 3 at 11:33 – 11:45). At that time, Dzionara-Norsen invited Couch and Turner into his apartment, but they declined and remained on the outside landing. (Tr. 19; G. Ex. 3 at 11:48 – 11:50).

Dzionara-Norsen entered his apartment to retrieve the laptop and returned shortly thereafter with the laptop, which he gave to Couch, stating, "You can look anywhere on there." (Tr. 20; G. Ex. 3 at 12:11 – 12:12). In response to questioning from Couch, Dzionara-Norsen indicated that the laptop was the one he had used in March when he viewed the video and reiterated that Couch could "check anything on [t]here." (G. Ex. 3 at 12:18 – 12:42). Couch informed Dzionara-Norsen that because the laptop was used to view the child pornography, they needed to take it with them to "make sure it's clear." (G. Ex. 3 at 13:09 – 13:16). Couch told him that if the computer were clear, they would try to return it to Dzionara-Norsen. (G. Ex. 3 at 13:18 – 13:24). At that time, Dzionara-Norsen offered to retrieve the power cord for the laptop and went inside his apartment to get it. (Tr. 20-21; G. Ex. 3 at 13:36 – 13:44). Couch testified that the statements made by Dzionara-Norsen during the interview led him to believe that child pornography was contained on the laptop, and he therefore decided to seize it. (Tr. 21-22, 53-54).

Couch told Dzionara-Norsen that he did not have a property receipt form to give him, but that he would write down his contact information for Dzionara-Norsen. (G. Ex. 3 at 14:18 – 14:24). He also informed Dzionara-Norsen that he could give them consent to search the computer to ensure that "there's nothing on there" or they would have to get a search warrant. (G. Ex. 3 at 15:13 – 15:48). Dzionara-Norsen responded, "I can give you consent." (G. Ex. 3 at 15:48). Because he did not have a consent search form with him, Couch handwrote a document

5

for Dzionara-Norsen's signature.  (Tr. 22-23, 45-46; G. Ex. 3 at 15:51- 15:53; G. Ex. 5).  The

document provided: "I, Richard Dzionara-Norsen give the FBI consent to search my Dell laptop

computer for evidence of any crime."  (G. Ex. 3 at 17:09 – 17:16; G. Ex. 5).  The handwritten

document was signed by Dzionara-Norsen, as well as by Couch and Turner.  (G. Ex. 5).

After signing the consent, Dzionara-Norsen indicated that he had already deleted

the video from the computer, but that it was possible that "particles" of the video remained on

the laptop and might be recovered.  (G. Ex. 3 at 17:25 - 17:37).  Couch asked Dzionara-Norsen

about his mental health arrest a few months earlier and whether he felt stressed as a result of the

FBI's appearance at his apartment.  (G. Ex. 3 at 17:46 – 18:31).  Dzionara-Norsen responded that

he did not believe he was stressed, and Couch responded by informing him that the decision

whether to charge him would depend upon whether anything was found on the computer and

whether the United States Attorney or the District Attorney decided to initiate charges.  (G. Ex. 3

at 18:31 – 19:13).  Couch assured Dzionara-Norsen that he would be kept informed of the status

of the investigation, after which Couch and Turner left.  (G. Ex. 3 at 19:25 – 19:56).

Dzionara-Norsen was not arrested at that time.  (Tr. 24).  Couch testified that Dzionara-Norsen

was never frisked or handcuffed, nor did Couch or Turner make any threats or promises to

induce Dzionara-Norsen to talk to them.  (Tr. 11-13).

Later that day, Couch called Dzionara-Norsen and asked him to provide the

passcode for the laptop, which he did.  (Tr. 25, 56).  Couch called Dzionara-Norsen a second

time that day and asked him whether he would be willing to meet the next morning to submit to a

polygraph examination.  (Tr. 25-26, 56).  Dzionara-Norsen agreed, and the following morning he

arrived at the FBI office as arranged.  (Tr. 26-27).  Couch greeted Dzionara-Norsen in the lobby

and introduced him to Markovich, who conducted the examination.  (Tr. 27-30).  Couch did not

6

participate in the examination, but observed most of it from a different room.  (Tr. 28-30).

Dzionara-Norsen left after the conclusion of the examination.  (Tr. 28).


## II.    The June 14, 2018 Polygraph Examination

Markovich testified that he had been an agent with the FBI for approximately

sixteen years and was trained and certified as a polygraph examiner.  (Tr. 62).  According to

Markovich, he met Dzionara-Norsen at approximately 9:30 a.m. on June 14, 2018, in the lobby

of the FBI office in Henrietta, New York.  (Tr. 64-65, 88-89).  After Couch introduced him to

Dzionara-Norsen, he and Dzionara-Norsen walked to a windowless interview room.  (Tr. 66,

95-96).  Markovich testified that the room contained a desk and several chairs; although an

access card was required to enter the room, the room was not locked from the inside.  (Tr. 66,

95-96).

Markovich briefly summarized the examination to Dzionara-Norsen and advised

him that he was not under arrest and was free to leave.  (Tr. 68, 70).  Markovich reviewed an FBI

Advice of Rights form with Dzionara-Norsen by reading aloud the *Miranda* rights exactly as

they appeared on the digital form.[3]  (Tr. 71-73; G. Ex. 6).  Markovich instructed

---

[3]  Specifically, Markovich advised Dzionara-Norsen as follows:

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any
questions.
You have the right to have a lawyer with you during questioning.
If you cannot afford a lawyer, one will be appointed for you before any
questioning if you wish.
If you decide to answer questions now without a lawyer present, you have the
right to stop answering at any time.

(Tr. 73; G. Ex. 6).

Dzionara-Norsen to read aloud the consent section of the digital form. (Tr. 73-74, 98). According to Markovich, Dzionara-Norsen recited, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." (Tr. 73-74, 98; G. Ex. 6). Dzionara-Norsen and Markovich each signed the digital form using a stylus attached to the computer. (Tr. 74; G. Ex. 6).

Next, Markovich reviewed with Dzionara-Norsen a digital "Consent to Interview with Polygraph" form. (Tr. 74-75; G. Ex. 7). Markovich read the first section of the form aloud and asked Dzionara-Norsen to review the Waiver and Consent section, although he did not ask him to read it aloud. (Tr. 76-77, 98). Markovich confirmed with Dzionara-Norsen that he had not researched polygraph countermeasures, and they both signed the digital form. (Tr. 77; G. Ex. 7).

Markovich then administered the polygraph examination, which lasted approximately three hours. (Tr. 70). According to Markovich, their interaction was cordial, and Dzionara-Norsen appeared coherent and able to understand the conversation throughout the examination. (Tr. 80-81). When the examination ended, Dzionara-Norsen left the FBI office. (Tr. 85).

III.   **Dzionara-Norsen's Affidavit**

Dzionara-Norsen submitted affidavits in support of his suppression motions. (Docket ## 50, 59-2). According to those affidavits, Dzionara-Norsen suffers from autism, anxiety and depression, and has expressed suicidal intentions. (Docket # 59-2 at ¶ 4). In June 2018, Dzionara-Norsen was taking medication to address his mental health impairments and was

treating with a therapist.  (Docket # 59-2 at ¶¶ 5, 7).  According to Dzionara-Norsen, his mental

health issues and medications "impacted [his] ability to make decisions." (*Id.*).

    Dzionara-Norsen stated that he did not feel free to leave the June 13, 2018

interview with Couch and Turner.  (Docket ## 50 at ¶ 3; 59-2 at ¶ 3).  He further indicated that

he did not give Couch permission to take his laptop.  (Docket ## 50 at ¶ 4; 59-2 at ¶ 8).

Dzionara-Norsen maintains that he did not feel that he had any choice but to sign the consent to

search document provided by Couch.  (Docket ## 50 at ¶ 5; 59-2 at ¶ 9).  He also did not feel as

though he had any choice but to participate in the polygraph examination.  (Docket # 50 at ¶ 8).

According to Dzionara-Norsen, none of his actions or statements on June 13 or 14 were

voluntary and, in his estimation, his mental impairments and medications rendered him incapable

of making voluntary decisions at that time.  (Docket # 59-2 at ¶¶ 12-14).

## REPORT AND RECOMMENDATION

### I. Dismissal of Indictment

    Dzionara-Norsen seeks dismissal of the indictment on the grounds of selective

prosecution and insufficiency of the evidence.  (Docket # 59 at ¶¶ 36-59).  The government

counters that Dzionara-Norsen's dismissal motion is untimely and should not be considered by

the Court because the defendant did not seek leave to file it late.[4]  (Docket # 63 at ¶¶ 57-59).  In

any event, the government maintains that neither of the arguments advanced by Dzionara-Norsen

compels dismissal.  (*Id.* at ¶¶ 60-64, 66-80).

    With respect to the sufficiency of the indictment, Dzionara-Norsen argues that he

is entitled to dismissal because "there is insufficient evidence, as a matter of law, to establish

---

[4]  During oral argument of the motion on February 28, 2018, the Court indicated that it would entertain the
motion.  (Docket # 65).

[that] the video [charged in the indictment] meets the definition of child pornography," principally because the government does not know the identity or age of the individual depicted in the video. (Docket # 59 at ¶¶ 55-59). I agree with the government that whether the video at issue constitutes child pornography is a question of fact for the jury. *See United States v. Vonneida*, 2012 WL 6651919, at *4 (W.D.N.Y. ) ("the [i]ndictment is valid on its face and is based on a finding of probable cause returned by a duly constituted grand jury[;] . . . [u]nder these circumstances, whether the media allegedly possessed and produced by [defendant] contains child pornography is a question of fact for the jury") (collecting cases), *report and recommendation adopted by*, 2012 WL 6651927 (W.D.N.Y. 2012). Although Couch did not know the precise age of the female depicted in the video, he testified that based upon his experience he believed her to be prepubescent. (Tr. 18, 32). Moreover, according to the government, Dzionara-Norsen admitted during the June 13 interview that he downloaded and deleted child pornography, and the government maintains that Dzionara-Norsen subsequently estimated that he had downloaded approximately 200 videos of child pornography. (Docket # 63 at ¶¶ 70-71). Further, the government maintains that the forensic search of Dzionara-Norsen's computer identified titles indicative of child pornography. (*Id.* at ¶ 72).

In any event, it is well-established that an indictment that is valid on its face, as is the case here, cannot be dismissed on the grounds that is based on inadequate or insufficient evidence. *United States v. Williams*, 504 U.S. 36, 54 (1992); *United States v. Calandra*, 414 U.S. 338, 345 (1974); *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir. 1989), *cert. denied*, 493 U.S. 1081 (1990). Instead, the time to advance such a motion is after the government has presented its case at trial. *See*, *e.g.*, *United States v. Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992); Fed. R. Crim. P. 29(a).

10

Next, I turn to Dzionara-Norsen's contention that the indictment should be dismissed on the grounds of selective prosecution.  (Docket # 59 at ¶¶ 36-50).  I agree with the government that Dzionara-Norsen has failed to allege the elements necessary for a claim for selective prosecution.  (Docket # 63 at ¶¶ 60-64 (quoting *United States v. Murph*, 452 F. App'x 31, 33 (2d Cir. 2011) (summary order) ("to succeed on an allegation of selective prosecution, [the defendant] must show both that the decision to prosecute him was based on his race, religion, or the desire to prevent him from exercising his constitutional rights, and that other similarly situated individuals suspected of conduct of a similar type have not been prosecuted"), *cert. denied*, 566 U.S. 980 (2012)).  Dzionara-Norsen's selective prosecution allegation rests solely on the contention that the federal government typically prosecutes only individuals who possess greater quantities of illegal images or videos than Dzionara-Norsen allegedly did, deferring to the states the prosecution of those possessing small quantities.  (Docket # 59 at ¶¶ 36-50).  Even if true, this distinction does not present grounds for dismissal based on selective prosecution.  *See United States v. Schmutzler*, 2017 WL 4648146, *2 (M.D. Pa. 2017) ("[d]efendant is arguing that since states prosecute the majority of child pornography offenses, his prosecution by federal authorities amounts to selective prosecution[;] [u]nder this logic, the federal government could never prosecute child pornography offenses, drug offenses, weapon offenses, or any other offenses in which the majority of prosecutions are done by states, without the prosecution being vulnerable to attack on selective prosecution grounds[;] [s]uch an argument is patently untenable).  Accordingly, I recommend that Dzionara-Norsen's motion to dismiss the indictment be denied.

## II.    <u>Suppression of June 13, 2018 Statements</u>

I turn next to Dzionara-Norsen's motion to suppress the statements he made during the June 13, 2018 interview outside his residence on the grounds that they were obtained in violation of his *Miranda* rights and were not voluntarily made.  (Docket ## 47 at ¶¶ 47-49; 59 at ¶¶ 60-76).

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.  As the Second Circuit has stated:

> [I]nterrogation consists of express questioning or its functional equivalent. . . . [T]he overarching "custody" question is whether a reasonable person in the suspect's position would have understood [himself] to be subjected to restraints comparable to those associated with a formal arrest.

*United States v. FNU LNU*, 653 F.3d 144, 148, 153 (2d Cir. 2011) (internal quotations and brackets omitted).

In determining whether a defendant was in custody, a court must undertake a two-part analysis.  *United States v. Santillan*, 902 F.3d 49, 60 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1467 (2019).  First, the court must ask whether "a reasonable person in the defendant's position would have understood that he or she was free to leave."  *Id.*; *see United States v. Newton*, 369 F.3d 659, 672 (2d Cir.), *cert. denied*, 125 S. Ct. 371 (2004).  If the answer is affirmative, the inquiry concludes.  *United States v. Newton*, 369 F.3d at 672.  If, however, the

reasonable person would not have felt free to leave, the court must then proceed to the second

step of the analysis and determine whether, in addition to feeling not free to leave, "there was a

restraint of freedom of movement akin to that associated with a formal arrest." *United States v.*

*Santillan*, 902 F.3d at 60.

   "Only if the answer to this second question is yes was the person 'in custody for

practical purposes' and 'entitled to the full panoply of protections prescribed by *Miranda*.'"

*Newton*, 369 F.3d at 672 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)); *see United*

*States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) ("[d]ecisions in this circuit have emphasized

that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities

affirmatively convey the message that the defendant is not free to leave"). Thus, "[a]lthough

both elements are required, the second is the ultimate inquiry because a free-to-leave inquiry

reveals only whether the person questioned was seized[,] . . . a necessary, but not sufficient,

condition [of custody]." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (internal

quotations omitted). Considerations relevant to the second inquiry include "whether the suspect

[was] told that he or she is free to leave, the location and atmosphere of the interrogation, the

language and tone used by the law enforcement officers, whether the subject [was] searched or

frisked, and the length of the interrogation." *Santillan*, 902 F.3d at 60.

   In examining whether a statement was made voluntarily, a court must consider the

totality of the circumstances in which it was given "to determine whether the government agents'

conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not

freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States*

*v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003

(1993). Depending upon the totality of the circumstances, a confession may be deemed

involuntary if police engage in conduct that is "false, misleading, or intended to trick and cajole the defendant into confessing." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (internal quotations omitted). In other words, although "coercive police activity is a necessary predicate to holding a confession constitutionally involuntary," evidence of trickery or deception on the part of law enforcement is only one factor to consider in evaluating the voluntariness of a confession. *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) and *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)); *see also United States v. Peterson*, 2018 WL 6061571, *6 (D. Conn. 2018) ("law enforcement's use of deception is a factor that courts should consider when determining from the totality of all the circumstances whether a defendant's will was overborne in a particular case") (internal quotations omitted). As a general matter, "[t]he failure to disclose the details of an investigation, or the fact that the suspect is a target of an investigation does not constitute affirmative deceit." *See United States v. McFarland*, 424 F. Supp. 2d 427, 437 (N.D.N.Y. 2006). "However, deliberate lies in response to a suspect's questions concerning the investigation or whether he is a target are probative factors demonstrating involuntariness." *Id.*

Under circumstances involving deception, "[a] court must still make specific findings that under the totality of the circumstances the defendant's will was overborne by the police conduct." *United States v. Haak*, 884 F.3d at 409 (internal quotation omitted). Specifically, the court must assess: "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *Id.* (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)). The inquiry is an objective one. *See United States v. Ortiz*, 943 F. Supp. 2d 447, 456 (S.D.N.Y. 2013) (in determining whether a confession is voluntary, "the inquiry into voluntariness is objective . . . [and] based on

the totality of the circumstances"); *United States v. McFarland*, 424 F. Supp. 2d at 436 ("if the police engage in objective behavior constituting impermissible trickery, deceit or coercion, that behavior may undermine a suspect's essential knowledge of his rights and the effect of abandoning [them][;] . . . a defendant's subjective reasons for waiving his *Miranda* rights are irrelevant").

Having reviewed the audio recording of the encounter, and considering the testimony offered by Couch, which I find credible, I conclude that Dzionara-Norsen was not in custody during the June 13, 2018 interview. Couch and Turner approached Dzionara-Norsen's residence in plain clothes and did not display their weapons. They knocked on the door, identified themselves, and informed Dzionara-Norsen that they wanted to talk to him about his child pornography activity.

The record demonstrates that Dzionara-Norsen agreed to speak with Couch and Turner and did so on the landing outside the door to his apartment. He was not handcuffed, searched, or threatened by Couch and Turner. Further, the evidence demonstrates that the encounter was relatively brief (indeed, Couch stated at the beginning of the interview that they would be leaving in a few minutes) and that Dzionara-Norsen was calm and coherent throughout. On two separate occasions Dzionara-Norsen re-entered his apartment by himself and voluntarily returned to the landing to continue the interview. When the interview concluded, the agents left the premises. Dzionara-Norsen was not arrested and apparently returned to his apartment. Based on the totality of the circumstances, I find that Dzionara-Norsen was not in custody, and *Miranda* warnings therefore were not required. *See United States v. Faux*, 828 F.3d at 135-36 ("courts rarely conclude, absent a formal arrest, that a suspect questioned in [his] own home is

'in custody'"); *Newton*, 369 F.3d at 675 ("absent an arrest, interrogation in the familiar

surroundings of one's own home is generally not deemed custodial").

   I further conclude that the evidence establishes that Dzionara-Norsen's statements

were voluntary and not coerced.  Although Dzionara-Norsen maintains that his mental health

issues, coupled with Couch's attempts to minimize the significance of the interview, amounted to

coercion that rendered his statements involuntary, I disagree.  As an initial matter, although

Dzionara-Norsen alleges that his mental health issues and the medications he took to treat them

"diminished his capacity" and "impacted [his] ability to make decisions"[5] (Docket # 59-2 at ¶¶ 7,

14), the audio recording demonstrates that Dzionara-Norsen was coherent, did not exhibit any

evident mental dysfunction, and seemingly understood the agents' questions and statements

during the interview.[6]  The record further makes clear that Dzionara-Norsen lived independently

---

[5]  The government contends that the court should give no weight to Dzionara-Norsen's affidavit because he declined to testify at the evidentiary hearing and the assertions in the affidavit have not been subjected to cross-examination.  (Docket # 63 at ¶¶ 38-40).  Although I am free to consider the defendant's affidavit, I agree that "it is a poor substitute for live testimony, which is the subject of cross-examination." *United States v. Nicholson*, 2016 WL 3970927, *3 (W.D.N.Y. 2016); *United States v. Riedman*, 2014 WL 713552, *16 (W.D.N.Y. 2014) (according defendant's affidavit consideration but less weight than conflicting testimony of government witnesses who were subject to cross-examination) (collecting cases).  In making this observation, the Court draws no adverse inference against Dzionara-Norsen based upon his decision not to testify. *United States v. Hill*, 2009 WL 922475, *4 (W.D.N.Y.) ("[a]lthough defendant ... had submitted an affidavit in support of his motion to suppress, he chose not to take the stand at the suppression hearing[;] ... [w]ithout drawing any adverse inference from his failure to testify, I simply indicate that, by not testifying, defendant has failed to contradict the government's evidence with his own testimony") (internal quotations and citations omitted), *report and recommendation adopted by*, 2009 WL 928322 (W.D.N.Y. 2009).

[6]  Even if there were some evidence – apart from his own conclusory assertions – that Dzionara-Norsen's mental impairments or medications affected his mental state, "a defendant's mental condition, by itself and apart from its relation to official coercion" does not "dispose of the inquiry into constitutional 'voluntariness.'" *Colorado v. Connelly*, 479 U.S. at 164-65, 167 ("while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry"[;] . . . rather, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"); *see also United States v. Raymer*, 876 F.2d 383, 386 (5th Cir.) ("[t]he relevant test . . . focuses . . . on the presence or absence of police coercion"), *cert. denied*, 493 U.S. 870 (1989).  "In other words, the police must somehow overreach by exploiting a weakness or condition known to exist." *United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir.), *cert. denied*, 513 U.S. 906 (1994); *Miller v. Dugger*, 838 F.2d 1530, 1537 (11th Cir.) ("*Connelly* makes clear that even the interrogators' knowledge that a suspect may have mental problems does not make the suspect's statements involuntary unless '[t]he police exploited this weakness *with coercive tactics*'") (quoting *Connelly*, 479 U.S. at 165), *cert. denied*, 486 U.S. 1061 (1988).  For the reasons discussed herein, I do not find that any tactics engaged in by Couch were sufficiently coercive as to render Dzionara-Norsen's statements involuntary.

at the time of his June 13 interaction with the agents and had earned a degree in mechanical engineering from Rochester Institute of Technology. (Tr. 78). The interview was conducted just outside of Dzionara-Norsen's residence, and was relatively brief – lasting approximately twenty minutes.

Unquestionably, Couch attempted to downplay the significance of the interview by, among other things, suggesting that Dzionara-Norsen was not a target, that the agents' real concern was to ensure that Dzionara-Norsen receive counseling, and that the matter was not really "important." Judged under relevant caselaw, however, those statements, even in combination with his allegations of mental health issues, are not sufficiently coercive as to render Dzionara-Norsen's subsequent waiver or statements involuntary. *See*, *e.g.*, *United States v. Mitchell*, 966 F.2d at 100 (defendants' statements voluntary even though agents de-emphasized criminal nature of inquiry); *United States v. Hughes*, 640 F.3d 428, 439 (1st Cir. 2011) (defendant's statements voluntary despite defendant's claim that troopers improperly led him to believe that he would not be arrested; "the key question is whether the troopers' actions, viewed objectively, coerced the defendant into speaking[;] [c]areful perscrutation of the record fails to disclose any extrinsic factors introduced by the troopers that could have distorted the defendant's judgment about whether to speak freely to them"); *United States v. Hutchinson*, 2013 WL 3938541, *12-13 (N.D. Ga. 2013) (officers' statements designed to minimize seriousness of interview, including statements that they did not think "it was that big of a deal" and that "it was not their purpose to lock him up," did not render statements involuntary; "[t]o the extent the officers' attempts to downplay the significance of [defendant's] statements amounted to trickery or deception, it is clear that the police's use of a trick alone will not render a confession involuntary") (internal quotation omitted); *United States v. Perry*, 2012 WL

17

447311, *2 (E.D. Mo. 2012) ("even if [the agent] had falsely stated to [d]efendant that the targets of their investigation were other individuals, and that [d]efendant was not the target, on these facts, [d]efendant's will was not overborne and any such representations would not be sufficient to require a suppression of [d]efendant's statements), *aff'd*, 714 F.3d 570 (8th Cir. 2013); *United States v. Kitchen*, 2008 WL 2997885, *6 (D. Utah 2008) (statements made by defendants were voluntary "[e]ven if [the investigator] advised the [d]efendants that they were not targets of the investigation"); *United States v. Gatherum*, 2007 WL 4788472, *9, 13 (S.D. W. Va. 2007) (defendant's statements voluntary despite officer's statement that defendant was not under arrest and free to leave even though officer had five arrest warrants at time of interview that he executed at conclusion of interview), *report and recommendation adopted by*, 2008 WL 200312 (S.D. W.Va. 2008), *aff'd*, 338 F. App'x 271 (4th Cir.), *cert. denied*, 558 U.S. 1083 (2009).

        My finding that Dzionara-Norsen's will was not overborne by the agents' minimization of the importance of the interview is underscored by the fact that Couch's statements regarding the purpose of the interview were vague and the interview as a whole reasonably suggested the possibility that Dzionara-Norsen might face criminal liability.  *See Haak*, 884 F.3d at 410 ("[a] court will not, however, readily imply [a] . . . misrepresentation from vague or ambiguous statements by law enforcement officers").  As the record makes clear, Couch specifically asked Dzionara-Norsen whether he understood that the conduct they were discussing was illegal, and Dzionara-Norsen acknowledged that he did.  (G. Ex. 3 at 6:46 – 6:48).  Further, towards the end of the interview, Couch advised Dzionara-Norsen that the decision whether he would face criminal charges rested within the discretion of the prosecutors and depended upon the contents of the computer.  (G. Ex. 3 at 18:31 – 19:13).

In sum, the totality of the record evidence relating to Dzionara-Norsen's individual characteristics and the conditions of the interview demonstrate that his statements were voluntary and that Couch's conduct did not have the effect of overbearing Dzionara-Norsen's will. Accordingly, I recommend that the district court deny Dzionara-Norsen's motion to suppress statements he made to the agents outside his apartment on June 13, 2018.

## III.   <u>Suppression of Evidence</u>

Dzionara-Norsen seeks to suppress evidence obtained during a forensic search of the Dell laptop computer seized by Couch and Turner during the June 13, 2018 interview. (Docket ## 47 at ¶¶ 36-46; 59 at ¶¶ 79-89; 66). Dzionara-Norsen maintains that the laptop was unlawfully seized without a warrant and that his subsequent consent to the search of the laptop was not voluntary. (Docket ## 47 at ¶¶ 36-46; 59 at ¶¶ 79-89; 66 at ¶¶ 24-42). He further contends that even if the consent was voluntary, a forensic search of the computer exceeded the scope of his consent. (Docket # 66 at ¶¶ 43-44). Finally, he maintains that the good faith exception to the warrant requirement does not apply in this case. (*Id.* at ¶ 45).

### A.   <u>Seizure of the Laptop</u>

There is no dispute that the agents seized the laptop that Dzionara-Norsen handed to them without warrant authorization. Dzionara-Norsen contends that the seizure was thus unlawful. (Docket ## 47 at ¶ 41; 59 at ¶ 81). The government counters that no warrant was required because probable cause existed to believe the computer contained evidence that Dzionara-Norsen had viewed child pornography using the device and that its seizure was necessary in order to preserve that evidence. (Docket ## 63 at ¶ 47; 67 at 2-6). Dzionara-Norsen

disputes both that probable cause existed and that immediate seizure of the computer was necessary to prevent destruction of any such evidence. (Docket ## 59 at ¶¶ 82-85; 66 at ¶¶ 25-30).

The Fourth Amendment generally prohibits law enforcement officers from conducting a warrantless search or seizure of a defendant's residence or property. *See* U.S. Const. amend. IV; *United States v. Place*, 462 U.S. 696, 701 (1983) ("seizure of personal property [is] *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant"). Nevertheless, "[w]here law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant" the Fourth Amendment permits "seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it." *United States v. Martin*, 157 F.3d 46, 53 (2d Cir. 1998) (quoting *United States v. Place,* 462 U.S.at 701); *see Kentucky v. King*, 563 U.S. 452, 460 (2011) ("[o]ne well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment") (internal quotation omitted); *United States v. Blood*, 429 F. App'x 670, 671 (9th Cir. 2011) ("[a] laptop computer is entitled to the same Fourth Amendment protection as other closed containers and personal effects").

In determining whether exigent circumstances exist, "[t]he core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action," including action "to prevent the imminent destruction of evidence." *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011) (internal quotations omitted). The test for determining whether a warrantless seizure

is justified by exigent circumstances "is an objective one that turns on the . . . totality of circumstances confronting law enforcement agents in the particular case." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (citations omitted), *cert. denied*, 498 U.S. 1119 (1991).

   I have little trouble concluding that probable cause existed to believe that the Dell laptop contained evidence of a crime relating to child pornography. *United States v. Herron*, 18 F. Supp. 3d 214, 224 (E.D.N.Y. 2014) ("[p]robable cause to seize property exists when 'the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime'") (quoting *Texas v. Brown,* 460 U.S. 730, 742 (1983)).  Prior to his interaction with Dzionara-Norsen on June 13, 2018, Couch had reason to believe that someone associated with the IP address subscribed to by Dzionara-Norsen's mother possessed a video depicting child pornography involving a prepubescent minor.  During the interview, Dzionara-Norsen admitted that he had possessed the video and that he had viewed it using the Dell laptop.  Although he told Couch that he had deleted the video from the computer, he conceded that evidence of the video might still be contained on the laptop.  Specifically, he told Couch that "particles" of the video might still be contained on the laptop.  (G. Ex. 3 at 17:25 – 17:37).  Despite Dzionara-Norsen's contentions to the contrary (Docket # 59 at ¶ 84), this information was sufficient to provide Couch with probable cause to believe that the laptop contained evidence of child pornography.  *See United States v. Bradley*, 2010 WL 2471885, *2 (E.D. Ky. 2010) (probable cause to believe computer contained evidence of child pornography existed where computer was matched to the "Globally Unique Identifier" that had previously been associated with downloading suspected child pornography files), *aff'd*, 488 F. App'x 99 (6th Cir. 2012); *United States v. Stiles*, 2010 WL

1727966, *5 (D.S.D. ) ("[o]nce [d]efendant admitted the auto shop computer contained child pornography, the [a]gents had probable cause to seize it without a warrant"), *report and recommendation adopted by*, 2010 WL 1707802 (D.S.D. 2010).

Further, the record establishes a sufficient basis to believe that the evidence might have been destroyed if Dzionara-Norsen had been allowed to retain the laptop pending application for a judicial warrant.[7]  According to Couch, he seized the laptop because he "believed there to be probable cause that there was child pornography on that computer." (Tr. 22).  Based upon the agents' statements and questions, Dzionara-Norsen knew that they were investigating his possession of a video containing suspected pornography that had once been stored on the laptop, as well as his general involvement with child pornography.  Further, Dzionara-Norsen's statements themselves evidenced his knowledge that possession of child pornography was illegal and that remnants of the video might be contained on the laptop.  His awareness of the investigation and its potential to expose him to criminal liability, coupled with the "fragile and easily destructible nature of . . . digital evidence," *see United States v. Blood*, 429 F. App'x at 671, provided sufficient exigencies to justify the warrantless seizure of the laptop.  *See United States v. Bradley*, 488 F. App'x 99, 103 (6th Cir. 2012) (concern that evidence might be destroyed was objectively reasonable under the totality of the circumstances where defendant knew that law enforcement was investigating child pornography and that his computer's identifier matched the identifier of the computer that had downloaded the suspected child pornography; "it is objectively reasonable to seize a container an officer has probable cause to believe contains evidence of a crime, rather than leave it unguarded in the hands of a suspect

---

[7]  To the extent that Dzionara-Norsen contends that the officers ordered him to retrieve the computer from his apartment (Docket # 47 at ¶ 41), I disagree.  To the contrary, the record demonstrates that Dzionara-Norsen voluntarily retrieved the laptop from his apartment in response to Couch's request.

who knows that it will be searched"); *United States v. Diaz*, 435 F. App'x 329, 332 (5th Cir.

2011) (warrantless seizure of laptop justified by defendant's knowledge that agents were

investigating possession of child pornography and where "the easily destructible nature of the

evidence in which the agents were interested – i.e., digital images of child pornography"

supported reasonable conclusion that images might be destroyed if the laptop were not seized);

*Blood*, 429 F. App'x at 671 (exigent circumstances existed given the destructible nature of the

evidence and defendant's admissions that the laptop contained child pornography files and that

he knew child pornography was illegal); *United States v. Martin*, 180 F Supp. 3d 373, 380

(E.D.N.C. 2016) ("[t]he sum of all the circumstances known to [the officer] at the time he made

the seizure of defendant's property made it reasonable for him to believe that defendant knew

police were 'on his trail'"); *United States v. Jarman*, 61 F. Supp. 3d 598, 604 (M.D. La. 2014)

(law enforcement properly seized hard drive where defendant "could have taken a variety of

measures to destroy potential evidence on the hard drive, including corrupting data or destroying

the hardware itself" had it been returned to defendant), *aff'd in part*, 847 F.3d 259 (5th Cir.

2017) ; *United States v. Stiles*, 2010 WL 1727966 at *5 ("[b]ecause the [d]efendant had already

admitted the [computer] contained child pornography, there was a risk the computer would

disappear if the [a]gents did not immediately seize it").[8]

---

[8] The government's submission relies heavily upon *United States v. Stroke*, 2018 WL 4588174 (W.D.N.Y. 2018), in support of its contention that the warrantless seizure was justified by exigent circumstances. (Docket # 67 at 3-4). This decision was superseded by an amended report and recommendation. *See United States v. Stroke*, 2019 WL 1960207, *1 (W.D.N.Y. 2019) ("[t]he Amended Report and Recommendation replaces the first Report and Recommendation in its entirety"). Although the amended report and recommendation addressed the warrantless seizure of the laptop, it did so in a section that became operative "if and only if [the District Court] decline[d] to adopt Section IV and cho[se] not to suppress evidence on the basis of the permanent injunction." *Id.* at *22. The case resolved by plea prior to any ruling by the district court on the objections to the amended report and recommendation, and the district court found that the decision was of "no binding or precedential value" and could not be cited. *See United States v. Stroke*, No. 14-CR-45S, Docket # 259.

**B.** **Search of the Laptop**

In addition to challenging the seizure of the laptop, Dzionara-Norsen also challenges the subsequent warrantless search of the laptop on the alternative grounds that the consent he gave was involuntary and that the forensic search exceeded the scope of any valid consent he gave. (Docket ## 47 at ¶¶ 36-46; 59 at ¶¶ 87-89; 66 at ¶¶ 33-44). The government maintains the warrantless search was consistent with Dzionara-Norsen's voluntary consent. (Docket ## 63 at ¶¶ 41-56; 67).

It is well-established that a warrantless search is permissible if based upon the valid consent of a person authorized to provide consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995), *cert. denied*, 516 U.S. 1050 (1996). The consent need only be voluntary, that is, obtained without coercion, even if it was given without knowledge of the right to refuse consent. *See Schneckloth v. Bustamonte*, 412 U.S. at 241-42; *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).

Voluntariness is determined based upon the totality of the circumstances. *Schneckloth*, 412 U.S. at 227; *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir. 1993); *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990). Among the relevant considerations are: age, education, background, physical and mental condition, the setting in which the consent is obtained, whether *Miranda* warnings have been administered, and whether the individual understands the right to refuse consent. *See Schneckloth*, 412 U.S. at 226; *United States v. Kon Yu-Leung*, 910 F.2d at 41. "Courts have also considered relevant factors such as whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, . . . and whether the defendant previously had refused to consent." *United States v. Schaefer*, 859 F. Supp. 2d

397, 407 (E.D.N.Y. 2012) (internal quotations omitted), *aff'd*, 519 F. App'x 71 (2d Cir. 2013) (summary order).

"Consent must be a product of [an] individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citations omitted), *cert. denied*, 511 U.S. 1130 (1994). The government bears the burden of establishing by a preponderance of the evidence that the consent was voluntary. *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830 (1981). "The ultimate question presented is whether the officer had a reasonable basis for believing that there ha[d] been consent to the search." *United States v. Isiofia*, 370 F.3d at 231 (internal quotations and citations omitted).

As an initial matter, I reject Dzionara-Norsen's contention that the computer search was unlawful because the agents attempted to obtain his consent rather than a judicial warrant. (Docket # 66 at ¶ 33). Simply stated, "obtaining consent need not be an option of last resort by law enforcement officers[,] . . . [and] there is absolutely nothing improper with agents seeking a valid consent to search even in situations where they have probable cause to obtain a warrant." *United States v. Schaefer*, 859 F. Supp. 2d at 413 ("even assuming *arguendo* that the agents had probable cause to search the defendant's home and computer, the fact that they chose to seek consent first has no legal significance as to the validity of the consent").

Considering the totality of the circumstances, I find that Dzionara-Norsen voluntarily consented to the search of his laptop.[9] First, the circumstances of the interview were

---

[9] My finding that the seizure of the laptop was lawful disposes of Dzionara-Norsen's contention that his consent was tainted by that seizure. (*See* Docket # 59 at ¶ 89). *See United States v. Tehrani*, 826 F. Supp. 789, 802 (D. Vt. 1993) (argument that consent was tainted by illegal seizure unavailing "[b]ecause the [c]ourt found the seizures to be valid under the Fourth Amendment"), *aff'd*, 49 F.3d 54 (2d Cir. 1995).

not significantly intimidating. The interview was conducted just outside of Dzionara-Norsen's apartment, he was not restrained, no physical force was used against him, and he twice re-entered his apartment and returned outside to continue speaking to the agents. Couch and Turner spoke in a conversational tone, were dressed in plain clothes, displayed no weapons, and made no threats or promises to Dzionara-Norsen to induce him to speak or to provide his consent. Dzionara-Norsen, an adult living independently, appeared coherent and responsive throughout the interview.

Dzionara-Norsen argues that his consent was nonetheless involuntary because Couch preyed on his known mental health impairments through deceptive conduct designed to coerce his consent. (Docket # 66 at ¶¶ 36-41). I disagree. Although consent maybe rendered invalid if "the police misrepresentation of purpose is so extreme [that] a person is deprived of the ability to make a fair assessment of the need to surrender his privacy," the "use of trickery and deception by law enforcement officers does not itself require or preclude a finding that an authorized person voluntarily consented to a search." *United States v. Monzon-Luna*, 2013 WL 6175818, *5 (E.D.N.Y. 2013) (internal quotations and brackets omitted); *see Schofield v. Magrey*, 2015 WL 521418, *3 (D. Conn. 2015) ("[i]f consent is given on the basis of 'police misrepresentation of purpose,' it is only invalid where it is so extreme that 'a person is "deprived of the ability to make a fair assessment of the need to surrender his privacy"'") (quoting *United States v. Montes-Reyes,* 547 F. Supp. 2d 281, 288 (S.D.N.Y.2008)). "Rather, the totality of the circumstances – including, naturally, the nature of the deception used – must still be considered in determining whether such consent was voluntarily given." *United States v. Montes-Reyes*, 547 F. Supp. 2d at 290 (internal quotations and citation omitted).

As discussed at length *supra*, Couch's conduct during the interview included statements meant to minimize the seriousness and the criminal character of the investigation. In this regard, Couch suggested that Dzionara-Norsen was not a "target" and that the main purpose of the agents' interview was to ensure that he got counseling. That said, Couch directly asked Dzionara-Norsen whether he understood that the conduct about which he was being questioned was illegal. Moreover, following execution of the written consent, Couch explained to Dzionara-Norsen that the decision whether criminal charges would be brought would be made by the United States Attorney or the District Attorney and depended upon the results of the laptop examination. Viewing the totality of the circumstances, I do not find that Couch's tactics were sufficiently coercive or deceptive so as to deprive Dzionara-Norsen of his "ability to make a fair assessment of the need to surrender his privacy" and to render his consent involuntary. *See United States v. Funds in the Amount of $830,000 in United States Currency*, 2019 WL 95169, *8 (N.D. Ill. 2019) (consent not involuntary even though officer engaged in "subterfuge when he described the purpose of the search"; "an agent's misrepresentation invalidates consent only when it undercuts the voluntariness of the consent to search, that is, it overbears a suspect's free will and prevents rational decision-making") (internal quotations and brackets omitted); *United States v. Monzon-Luna*, 2013 WL 6175818 at *5 ("[a]lthough the ruse misrepresented the true purpose of the agents' visit and capitalized on [defendant's] desire to assist law enforcement, it did not create a false sense of exigent circumstances that deprived the defendant of his ability to assess the need to surrender his privacy"); *United States v. Herndon*, 2008 WL 11410105, *3 (D. Conn. 2008) (consent to search valid where purpose of search was to investigate defendant's report of identity theft and defendant "knew that an investigation of his identity theft was related to credit card purchases of pornography . . . [and was] aware of the possibility that the results of

the search could lead to his arrest").  Similarly, Couch's statement that he would obtain a warrant in the absence of Dzionara-Norsen's consent did not render the subsequent consent involuntary. *See United States v. Bartee*, 2013 WL 6164339, *10 (S.D.N.Y. 2013) ("[i]t is well accepted that notifying a party that a warrant could be obtained does not constitute impermissible coercion"); *United States v. Anderson*, 752 F. Supp. 565, 568 (E.D.N.Y. 1990) ("[w]here the statement of ability or intent to obtain a warrant is well-founded, it will not undermine the voluntariness of the consent"), *aff'd*, 929 F.2d 96 (2d Cir. 1991).

Nor do I find that the forensic search of the laptop exceeded the scope of the consent provided by Dzionara-Norsen.  (Docket # 66 at ¶¶ 43-44).  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  *Winfield v. Trottier*, 710 F.3d 49, 53 (2d Cir. 2013) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).  Although a "suspect may . . . delimit as he chooses the scope of the search to which he consents[,]" the salient question is "whether, based on the exchange between the officer and the suspect, a typical reasonable person would believe that 'the consent given by [the suspect] authorized such a search for such a purpose.'"  *United States v. Peterson*, 2018 WL 6061571 at *13 (quoting *id.* at 56).  The scope of consent must be evaluated under the totality of the circumstances.  *See United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005).

Reasonably construed, Dzionara-Norsen's conduct and statements during his interaction with Couch and Turner evidenced his knowing and voluntary consent to a full forensic search of his computer.  After handing the laptop to Couch, Dzionara-Norsen told Couch that he could "check anything on" the laptop.  Couch advised Dzionara-Norsen that he

was going to take the computer to make sure it was "clear," at which point Dzionara-Norsen

offered to provide the laptop's power cord.  In response to Couch's statement that he needed

either Dzionara-Norsen's consent or a warrant to search the computer, Dzionara-Norsen stated,

"I can give you consent."  Couch informed him that the search would be conducted that week.

Couch drafted, and Dzionara-Norsen signed, a handwritten document reflecting

Dzionara-Norsen's agreement that the computer could be searched for "evidence of any crime."

Dzionara-Norsen also acknowledged his understanding that the search might uncover "particles"

of the deleted video depicting child pornography – a statement that demonstrates his expectation

that a forensic examination of the laptop would occur.

   In sum, during the course of the interview, Couch made clear to Dzionara-Norsen,

and Dzionara-Norsen confirmed his understanding, that the laptop would be searched for

evidence of child pornography.  Dzionara-Norsen was told that the laptop would be taken and

held by the FBI possibly for up to several days in order to permit a full search of the computer.

With this knowledge, Dzionara-Norsen authorized a full search of the computer; he did not

attempt to limit the parameters of the search in any manner.  That Dzionara-Norsen later

provided to Couch the laptop passcode further undermines his current contention that his consent

was limited in scope.  *See United States v. Barrett*, 750 F. App'x 19, 22 (2d Cir. 2018) (summary

order) ("[defendant] having twice unlocked his phone and said "OK" in handing it to [the

detective], . . . a reasonable person would not have had cause to believe that the search was

limited in some way") (internal quotations and brackets omitted), *partially vacated on other

grounds*, 937 F.3d 126 (2d Cir. 2019).  Under the totality of these circumstances, I conclude that

the forensic search of the laptop was consistent with Dzionara-Norsen's consent, articulated

verbally and in writing.  *See United States v. Colon-Gentile*, 2014 WL 2157541, *6 (E.D.N.Y.

2014) (although agent suggested that purpose of search was to identify persons suspected of producing child pornography, the language of written consent form signed by defendant authorized search for any "evidence of a crime or other violation of the law" and thus permitted search for evidence of possession of child pornography); *United States v. Al-Marri*, 230 F. Supp. 2d 535, 539-40 (S.D.N.Y. 2002) (search of computer did not exceed consent where agents asked to take computer to FBI office, defendant did not place any explicit limitation on the scope of the search, and defendant clearly understood "the technological resources of the FBI and its ability to thoroughly examine his computer").

Under these circumstances, I find that Dzionara-Norsen's consent was voluntary and lawful and authorized a full forensic search of the laptop.[10]  For these reasons, I recommend that the district court deny Dzionara-Norsen's motion to suppress tangible evidence.

IV.    **Suppression of June 14, 2018 Statements**

The basis for Dzionara-Norsen's challenge to the statements he made on June 14, 2018 is somewhat unclear.  Initially, he maintained that some of the statements were subject to suppression on the grounds of a *Miranda* violation and that the remaining statements were inadmissible on the grounds that polygraph results are inherently unreliable.[11]  (Docket ## 47 at ¶ 47; 50 at ¶¶ 6-8.  At the conclusion of the evidentiary hearing, counsel for Dzionara-Norsen clarified that he was seeking to suppress the statements made on June 14, 2018 on the grounds that they were the tainted by the unlawful conduct (both the un-*Mirandized* interrogation and the

---

[10]  Having concluded that the search was authorized by Dzionara-Norsen's voluntary consent, I need not reach the government's alternative argument that suppression is not warranted because the agents acted in good faith.  (Docket # 67 at 10-11).

[11]  This decision does not address the admissibility at trial of evidence concerning the polygraph examination; issues relating to admissibility should be raised with the trial judge.

warrantless seizure) that occurred the previous day. (Docket # 57 at 102-04). In his post-hearing submission, Dzionara-Norsen challenges the June 14, 2018 statements as the tainted fruit of the June 13, 2018 interview at Dzionara-Norsen's apartment. (Docket # 59 at ¶¶ 77-78).

Having concluded that Dzionara-Norsen's rights were not violated on June 13, 2018, I find that his statements made on June 14, 2018 were not tainted by any of the events of the previous day. Moreover, the record refutes any contention by Dzionara-Norsen that he was subjected to custodial interrogation on June 14, 2018 in the absence of *Miranda* warnings (Docket ## 47 at ¶ 47; 50 at ¶¶ 6-8), namely, through the credible testimony of Markovich that he read *Miranda* warnings to Dzionara-Norsen prior to conducting the polygraph examination. Accordingly, I recommend that the district court deny Dzionara-Norsen's motion to suppress statements made on June 14, 2018.

## DECISION AND ORDER

### Grand Jury Materials

The final reserved motion is Dzionara-Norsen's application for *in camera* review of the grand jury minutes. (Docket # 59 at ¶¶ 49-50). The Court asked for clarification of the request during oral argument on February 28, 2018. (Docket # 65). Counsel for Dzionara-Norsen explained that he seeks an *ex parte* review by the Court of the grand jury minutes and rulings on any issues identified as a result of such review.

There is a presumption that grand jury proceedings are lawful and regular, *United States v. Torres*, 901 F.2d 205, 232 (2d Cir.) (quoting *Hamling v. United States*, 418 U.S. 87, 139 n.23 (1974)), *cert. denied*, 498 U.S. 906 (1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010), and disclosure of grand jury proceedings is available

only by order of the Court.  Fed. R. Crim. P. 6(e).  A party seeking disclosure bears the burden of establishing a "particularized need" or "compelling necessity" for such disclosure that outweighs the policy of grand jury secrecy.  *Douglas Oil Co. of Cal. v. Petrol Stops Northwest*, 441 U.S. 211 (1979); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959); *In re Rosahn*, 671 F.2d 690, 695 (2d Cir. 1982).  This same standard applies to requests for *in camera* review of the grand jury minutes.  *See United States v. Smith*, 105 F. Supp. 3d 255, 261 (W.D.N.Y. 2015) ("[a] review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct[,] . . . [t]his standard applies equally to a defendant's request for the court to conduct *in camera* inspection of grand jury transcripts") (internal citation and quotations omitted; collecting cases).  I find that Dzionara-Norsen has not satisfied his burden of establishing a particularized need or compelling necessity for the requested *in camera* inspection.  *See Pittsburgh Plate Glass Co. v. United States*, 360 U.S. at 400.  Accordingly, Dzionara-Norsen's request for *in camera* review of the grand jury minutes is denied.

## **CONCLUSION**

For the reasons stated above, Dzionara-Norsen's motion for *in camera* review of the grand jury minutes **(Docket # 59)** is **DENIED**.  Further, for the reasons stated above, I recommend that the district court deny Dzionara-Norsen's motions to dismiss the indictment on the grounds of insufficiency and selective prosecution.  **(Docket # 59)**.  In addition, for the

reasons stated above, I recommend that the district court deny Dzionara-Norsen's motions to suppress evidence and statements.  **(Docket ## 47, 59, 66)**.

**IT IS SO ORDERED.**


*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       April 17, 2020

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[12]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                              *s/Marian W. Payson*
                                         MARIAN W. PAYSON
                                 United States Magistrate Judge

Dated: Rochester, New York
        April 17, 2020

---

[12]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).